

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-2003

# USA v. Hakim

Precedential or Non-Precedential: Precedential

Docket No. 02-3720

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Hakim" (2003). *2003 Decisions.* Paper 223.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/223

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 22, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3720

UNITED STATES OF AMERICA

v.

KHALIL ABDUL HAKIM
a/k/a
ANTHONY LOWERY
Khalil Abdul Hakim,
*Appellant*

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 02-cr-00131-1)
District Judge: Honorable John R. Padova

Argued: June 30, 2003

Before: SLOVITER, AMBRO, and BECKER,
*Circuit Judges*

(Filed: September 22, 2003)

ROBERT EPSTEIN (Argued)
Assistant Federal Defender
DAVID L. McCOLGIN
Supervising Appellate Attorney
MAUREEN KEARNEY ROWLEY
Chief Federal Defender
Federal Court Division
Defender Association of Philadelphia
Suite 540 West - Curtis Center
Independence Square West
Philadelphia, Pennsylvania 19106

*Counsel for Appellant*

PATRICK L. MEEHAN
United States Attorney
LAURIE MAGID
Deputy United States Attorney for
Policy and Appeals
ROBERT A. ZAUZMER (Argued)
Assistant United States Attorney
Senior Appellate Counsel
FLOYD J. MILLER
Assistant United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-4476

*Counsel for Appellee*

## OPINION OF THE COURT

BECKER, *Circuit Judge*.

Khalil Abdul Hakim was charged in connection with the robbery by two armed men of a PNC Bank in Norristown, Pennsylvania after an eyewitness saw a truck bearing a "Boone's Moving and Hauling" sign speed away from a parking lot near the robbery. Hakim was one of three employees of Boone's, and the other two employees identified him as one of the robbers from a "somewhat blurred" [A283] photograph from the scene of the crime. A jury subsequently convicted Hakim of four counts: (1)

conspiracy to commit armed bank robbery, 18 U.S.C. § 371; (2) armed bank robbery, 18 U.S.C. § 2113(d); (3) using and carrying a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1); and (4) using, carrying, and brandishing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii).

Hakim makes two contentions on appeal. First, he asserts that the District Court erred by refusing to grant his motion for a mistrial based on the admission of testimony that Hakim "smokes crack," "take[s] pills," and will take "anything that will make him high." [A451.] Although the District Court instructed the jury to disregard this testimony, Hakim contends that the instruction came too long after the testimony (30 minutes), by which point the substance of the testimony had become "etched in granite" in the minds of the jurors and thus incurable by instruction. Hakim also submits that the District Court's curative instruction to the jury was neither precise nor strong enough: it did not specifically mention that the jury was to disregard the testimony about Hakim's drug use, but rather referred to the testimony more generally, and, in Hakim's submission, it did not adequately emphasize to the jury that the testimony about Hakim's drug use should play no part in its deliberations.

Although the timing of a jury instruction may impact whether the damage from improperly admitted testimony can be undone, we conclude that the jury instruction was in fact curative. We generally presume that juries follow instructions given by the District Court, and the time lapse between the testimony and the curative instruction here was not long enough to overcome that presumption. Moreover, during much of the thirty minutes that passed, the jury was in recess and was presumably not contemplating Hakim's drug use, a fact which further suggests that the testimony had not become indelibly ingrained in the minds of the jurors. As to the content of the instruction, it appears that the District Court made a considered decision not to mention the word "drugs" a second time while giving the instruction, so as not to compound the damage done by the admission of the testimony, an approach with which Hakim's counsel

apparently agreed since he did not object to the vagueness or weakness of the jury instruction. We conclude that the District Court did not err in the language of this instruction.

Hakim's second contention is that he was denied the right to a fair trial because the government made reference, both during its questioning of Melvin Boone and its closing arguments, to the following: (1) the fact that he was Muslim; (2) his position as a Muslim spiritual leader; (3) his ability to speak Arabic; and (4) his travel to Saudi Arabia. The government alleges that it offered this to demonstrate that Boone, who identified Hakim as the robber in the surveillance photograph, respected Hakim as a spiritual and worldly man and that therefore Boone would not lie about his identification. Hakim responds that the government made reference to his faith and his travels to Saudi Arabia to suggest that he had connections to terrorism; the trial followed shortly after the tragedy of September 11, 2001 ("9/11").

We are underwhelmed by the government's explanation, and especially its contention that the prosecutor passed Hakim's passport around to the jury and called attention to the fact that he had traveled to Saudi Arabia in order to show that Boone thought Hakim was "worldly"; there is no indication in the record that Boone was even aware that Hakim had traveled to Saudi Arabia. However, counsel for Hakim did not object at any point to the government's references to Hakim's faith. Under that circumstance, we can hold that Hakim was denied the right to a fair trial on this ground only if we conclude that there was plain error, which requires, in part, that the error " 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.' "[1] *Johnson v. United States*, 520 U.S. 461, 467 (1997)(quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). We do not believe that Hakim's argument survives this very rigorous test. The judgment of the District Court will be affirmed.

---

1. Counsel did move, post-trial, for a new trial on the basis of these references to Hakim's faith. The District Court accepted the government's explanation for its actions and denied the motion.

I.

On November 28, 2001, two men brandishing firearms entered a PNC Bank branch located in Norristown, Pennsylvania and made off with $14,690. The bank robbers were caught on film, but as the District Court later noted, the surveillance photograph was "somewhat blurred." [A283.] The first robber entered the bank wearing a stocking over his face; the second robber (alleged to be Hakim) followed closely behind and entered the bank with his face exposed, but covered it with a stocking shortly thereafter.

Hakim was connected to the robbery when witness Robert Petersohn told the police that he had noticed a black early-to-mid 1980s Chevrolet S-10 pick-up truck with a sign reading "Boone's Moving and Hauling" speed away from a parking lot near the bank at the time of the robbery. Petersohn worked at an auto body shop in Norristown and, while taking a cigarette break, he noticed the black Chevy truck parked very closely next to his own Chevy pick-up; concerned about potential damage to his customized vehicle, Petersohn walked over to make sure the black Chevy had not scraped his own truck. [A187-190.] Petersohn later saw the pick-up truck drive quickly away down a back alleyway, but he was not able to see the occupants of the truck. [A196-97.] Another witness, Christopher Robbins, saw two men run across the street from the vicinity of the bank, one of whom got into a black "early 80's Chevy" pick-up truck with a sign on it (although he could not read the sign) and drove away. [A226-229.]

Investigators located the owners and employees of Boone's Moving and Hauling: Melvin Boone, Hakim (Boone's business partner), and James Gray, an employee. Boone and Gray identified Hakim as the man in the surveillance photograph. The Norristown police found a black Chevy S-10, with a "Boone's Moving and Hauling" sign, parked across from Boone's home on the morning of the robbery. The license plate on the truck belonged to a different truck, which was registered to Hakim. Gray and Boone stated that Hakim regularly drove the S-10 pick-up truck. Petersohn identified the vehicle as the one he had

seen parked next to his truck at the time of the bank robbery.

Based on this evidence, the government obtained a search warrant for Hakim's house. They found a baseball cap with an American flag on it similar to the one the second robber was wearing in the surveillance photograph. [A396-97.] They also found a pair of gray sweat pants similar to the one worn by the second robber. They did not, however, find the distinctive sweatshirt worn by the second robber. [A416.]

Three days after the bank robbery, Hakim purchased a used Lexus automobile for $6,700 in cash (nearly half the amount of money stolen.) [A171-72.] The vehicle was purchased with new $100 bills. [A172.] However, Hakim points out that he and Boone had received $4000 for a moving job shortly before the purchase of the Lexus and that he had purchased vehicles in the past for cash: another Lexus three years earlier for $5,300 and a Jeep for $6,000. Hakim also notes that he had received income from various rental properties he owned.

The initial description of the second bank robber given by the bank employees present at the time of the robbery did not match Hakim's appearance. Seqora Ward, the bank's service manager, testified that she made eye contact with the second robber before he put the stocking over his face. She had initially told police that the robber was "dark skin[ned]," [A361.], although at trial she testified that he had "light brown" skin. [A144.]. Hakim is a light-skinned African American man. Tawana West, the bank's sales manager, told officers that the second robber was "dark skinned" and between thirty-five and forty-five years of age. [A361.] Hakim is fifty-two years old. West also stated that the second robber was six feet tall and was of "medium weight." [A161-62.] Hakim stands five feet nine inches tall and weighs 205 pounds. [PSI #47.] The surveillance photograph shows that the second robber was approximately five foot nine and had a full beard.

Hakim was charged with four counts of armed bank robbery. The jury returned a verdict convicting Hakim on all counts and he was sentenced to fifty two months on

Counts One and Two, to run concurrently, and 84 months on Counts Three and Four, to run concurrently to each other but consecutively to Counts One and Two. The District Court also imposed five years of supervised release, restitution in the amount of $14,698 and a special assessment of $400. Hakim timely appealed.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's denial of a mistrial for abuse of discretion. *See United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001), *cert. denied*, 534 U.S. 1152 (2002). Since counsel objected neither to the content of the curative instruction nor to the references to Hakim's faith at trial, we review for plain error the content of the instruction and the question whether the government violated Hakim's right to a fair trial by making references to his faith. *See United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). To establish plain error, the defendant must prove that there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Johnson v. United States*, 520 U.S. 461, 467 (1997)(citations omitted).

## II.

### A.

We begin with the issue of the introduction of testimony about Hakim's drug use. This testimony was elicited in response to questions posed by defense counsel to Melvin Boone, one of the government's key witnesses. Boone was presented with a surveillance photo of the robbery and he identified Hakim as one of the participants. In order to challenge Boone's credibility as a witness, defense counsel presented evidence that Boone had been involved in the sale of illegal drugs. This testimony was given by James Gray, an employee of Boone's Moving and Hauling, who stated that when questioned about the robbery he had told

Detective Emrich that Boone had sold crack cocaine out of his girlfriend's apartment. [A432-36.] During the re-direct examination, the government attempted to bring out the fact that Gray had also told Emrich that Hakim used drugs. The government argued that this information was admissible under Fed. R. Evid. 106. Over Hakim's objection, the Court permitted the prosecutor to ask Gray, "Does Khalil (Hakim) smoke rock or do any drugs?" Gray answered, "Yes. He smokes, I've seen him smoking crack before. I've seen him take pills, anything that will make him high." [A451].[2]

After a recess, at a side bar, the District Judge informed counsel for both sides that he had decided to change his ruling on defense counsel's objection to Gray's testimony. Defense counsel welcomed this development and the Court's determination to give the jury a curative instruction, but stated that such an instruction would be inadequate to cure the prejudice to Hakim and moved for a mistrial, which was denied. When the jury re-entered the courtroom, approximately thirty minutes after Gray had finished testifying, the Judge told them that the evidence of Hakim's drug use had been improperly admitted and instructed them to disregard that testimony. The Court told the jury:

> Ladies and gentleman of the jury, there is a ruling that I do want to make you aware of. You'll recall that during the course of the Government's redirect examination of Mr. Gray, reference was made by the Government to a statement that Mr. Gray had made to Detective Emrich concerning the defendant's conduct. [Hakim's counsel] objected to that question, I overruled that objection and the contents of a statement made by

---

2. Fed. R. Evid. 106 provides that:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The decision to admit the answer under Rule 106 was plainly incorrect, as the Court later conceded.

Mr. Gray to Detective Emrich during that interview, was testified to by Mr. Gray.

I've decided to change my ruling in that regard. I am going to sustain the defendant's objection to that testimony. I'm going to strike that testimony out of this case completely and I instruct you — and this is an instruction which you must follow — that you are to disregard completely and entirely that question and the answer that was given to that question that has — that is to play no part whatsoever in your consideration with respect to the charges that have been made against this defendant in the indictment.

The only thing that this defendant is on trial for in this courtroom — the only thing he's on trial for — is that charged in the indictment and you know all about that up to now and I don't want anything at all to distract you from that focus and from that analysis. So, therefore, disregard that testimony completely and entirely.

[A469-70.]

Hakim contends that he was prejudiced by the Court's initial decision to admit the testimony and that the Court's curative instruction was insufficient.

We will assume, without deciding, that Gray's testimony about Hakim's drug use was prejudicial. This brings us to the question whether the District Court's instruction to the jury to ignore that part of Gray's testimony was sufficient to cure whatever prejudice may have resulted from it. Hakim asserts that it was not, for two reasons: it came too long after the key testimony and it was too vague to be effective.

### 1. The Delay in Giving the Instruction

Approximately thirty minutes passed between Gray's testimony about Hakim's drug use and the District Court's curative instruction. Hakim submits that by the time the Court gave its instruction, the fact of Hakim's drug use was already indelibly etched on the minds of the jurors, resulting in incurable prejudice against him.

We begin our analysis with the presumption that juries follow the instructions given by district courts. *See United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993)("In reviewing the district court's handling of the evidence that was subsequently stricken from the record, we presume that the jury will follow a curative instruction unless there is an 'overwhelming probability' that the jury will be unable to follow it and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant.")(citations omitted). The question then is whether the delay in this case was sufficient to overcome this presumption. We believe that it was not. We agree with Hakim that the lapse of time between an error and a curative instruction can be significant. In *United States v. Gullo*, for example, while the substance of particular curative instructions given at trial was adequate, "they came some twenty-four hours after the inadmissible question had been injected into the case" and "[w]hatever efficacy curative instructions possess cannot help but be weakened by the lapse of time." 502 F.2d 759, 762 (3d Cir. 1974). *See also United States v. Vaulin*, 132 F.3d 898, 901 (3d Cir. 1997)(denying the defendant's request for a new trial because "the trial judge *immediately* gave a strong curative instruction")(emphasis added); *United States v. Traitz*, 871 F.2d 368, 398 (3d Cir. 1989)(noting that a "timely curative instruction [was] given by the district judge").

Under the circumstances of this case, however, the delay was insufficient to overcome the presumption that the jury adhered to the dictates of the curative instruction. First, the delay was only about thirty minutes long, significantly shorter than the twenty-four hour delay at issue in *Gullo*. Second, much of the delay was taken up by a recess, during which the jurors were not hearing testimony and were taking a break from their contemplation of the case. Under these circumstances, we conclude that the fact of Hakim's drug use had not become so ingrained in the minds of the jurors that the curative instruction was insufficient to ameliorate any prejudice Gray's testimony might have caused Hakim.

We acknowledge that our conclusion arguably conflicts with that of the Court of Appeals for the Sixth Circuit in a

similar case, *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991). In *Solivan*, the defendant was on trial for selling cocaine, and the prosecutor urged the jury during his closing arguments to send a message to other drug dealers that "we don't want that stuff in Northern Kentucky." *Id.* at 1148. After twenty minutes had passed, including a recess, the district court admonished the jury, "[d]o not consider any urgings by the prosecutor to send messages to anybody. We're not here to send messages to anybody. We're here to try this defendant's case." *Id.* at 1149. On appeal, the Court of Appeals for the Sixth Circuit concluded that "[t]he admonition given by the district court in this case was given too late to eradicate the prejudice from the jurors' minds" and that the comments had become " 'etched in granite' in the jurors' minds." *Id.* at 1157. However, we view the Court's statement as hyperbolic, animated perhaps by the egregious nature of the prosecutor's statement. We see no reason why an admonition twenty minutes (or thirty, in this case) after the objectionable comments would be ineffective.

## 2. The Specificity of the Instruction

Hakim also argues that the District Court's instruction was too vague to ensure that the jury would disregard the testimony about his drug use. Rather than directly telling the jury to ignore any statements about Hakim's drug use, the Court chose to describe Gray's testimony only indirectly:

> You'll recall that during the course of the Government's redirect examination of Mr. Gray, reference was made by the Government to a statement that Mr. Gray had made to Detective Emrich concerning the defendant's conduct.

[A469-70].

The government argues that for a number of reasons the District Court's decision not to refer directly to the drug use testimony was not error. First, the government asserts that because the District Judge was actually able to see the jury, he was in a good position to gauge whether the jurors understood the reference to Hakim's "conduct." Second, the

government submits that the District Court purposefully declined to use the word "drugs" in its instruction because it did not want to cause Hakim further prejudice by explicitly repeating the testimony. Third, the government points out that Hakim's counsel did not object to the phrasing of the instruction, a fact which suggests that counsel agreed with the Judge's approach and believed the jury understood what the Judge was referring to.

We do not think that the instruction was impermissibly vague. The District Judge was discussing testimony that had been heard mere minutes earlier and was in a much better position than this Court to determine whether the jury understood what he was referring to. At all events, based on the transcript, the object of the Court's reference seems clear, and we cannot say that the content of the instruction amounted to plain error.

## B.   The Government's References to Hakim's Muslim Faith

Most of the government's references to Hakim's faith occurred during examination of Boone. Boone explained that he had met Hakim while attending a spiritual class, and they ultimately became business partners at Boone's Moving:

Q.  Would you describe for the jury . . . your relationship with the defendant.

A.   Yes. We were very close friends. As a matter of fact, spiritually, we was — we used to - - we used to go to Jumal, which is our spiritual classes together.

Q.  All right. When you say spiritual, what particular branch of religion do you subscribe to?

A.  Islam - - Muslims.

Q.  Muslims?

A.  Right.

Q.  So you attended spiritual classes together?

A.  Right.

13

Q. What role if any, did he play in the classroom setting?

A. He was very intelligent, he was the Eman [sic], that was, like, a head priest.

Q. Head priest.

A. Yes.

. . .

Q. Now I want to explore his role as Eman [sic] - - I believe as you call it - - and what position is that now in the Muslim faith?

A. That would be, like, head position to - - like a teacher in the class. In other words, he would be the head man of the Jumal, he would read the Koran and explain to us, different scenarios in the book. And he would make prayer and stuff like that, lead the prayer.

Q. Was he able to do this in English or Arabic?

A. Both - - both [A247-48.]

. . .

Q. Why did the two of you agree on that particular arrangement in terms of the duties that each of you would perform [in the business?].

A. Well, see, Khalil's educational background was strong and he had been, basically, scholarships he had and stuff like that. . . .

. . .

Q. Is it fair to say, you trusted him to handle the money?

A. Exact.

Q. And why did you have such trust in him?

A. I looked up to Khalil, I looked up to him a lot and - -

Q. Tell the jury why?

A. Spiritually, he - - spiritually, I looked up to Khalil very a lot, because he was an idol for me. I mean, I

14

never had nobody to really help me come through life, but I never put - - put trust in nobody, but I put trust in him, because I looked up to Khalil very - - so much - - I looked up to him.

[A252.]

During the government's closing arguments, the prosecutor passed around Hakim's passport, noting that he had traveled to Saudi Arabia:

Now, [Boone] told you that he had met the defendant, he had known him for about ten years, they were both members of the same religious community, Muslims. The defendant occupied the role of Iman, the spiritual lead of the congregation and that he looked up to him, he admired him. He said, he was a teacher, he was the leader.

And as you will see from the defendant's passport and I - - I urge you to take the time to look at this passport, not only from the standpoint of identification, but the facial hairs that was [sic] described by Seqora Ward and the skin tone color. But you may remember that I asked the question of Mr. Boone, he's the spiritual leader? Yes. He speaks Arabic and English. And if you will look in the passport, you will notice that in 1996, the defendant visited Saudi Arabia and there are a number of other stamps in the passport, all showing that he's a worldly man, he's well traveled.

Of course, a person like Melvin Boone - - from a family of twenty-one children, someone who cut grass, saved $1200 to try to start a business on his own, someone with no world travel, none of the worldly experiences that this defendant would have, of course Melvin Boone would respect a man like this.

[A475.]

Hakim argues that these references have no relation to the crime with which he was being charged: bank robbery. Boone was brought to the stand to identify Hakim as the second robber in the surveillance photograph. As such, Hakim maintains that the prosecution had only to establish that Boone was able to identify Hakim; testimony that he

had known Hakim for 10 years would have been sufficient. Hakim therefore contends that the government elicited the testimony about his faith in an attempt to peg him as a potential terrorist in the minds of the jurors and that such use of race or ethnicity is improper. *See, e.g., Moore v. Morton*, 255 F.3d 95, 113 (3d Cir. 2001)(holding that where the prosecutor suggested that the fact that the black defendant was married to a white woman, allegedly showing his preference for white women, made it more likely he had raped the white victim, "[r]acially or ethnically based prosecutorial arguments have no place in our system of justice.").

As noted above, because Hakim's lawyer did not object to the references to Hakim's faith at trial, we review the question whether the government violated Hakim's right to a fair trial for plain error. As Hakim points out, there are a handful of cases in which Courts of Appeals have remanded a matter for a new trial on the basis of the prosecutor's reference to a defendant's race or ethnicity, notwithstanding the failure of defense counsel to object at trial. In *United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990), for example, the Court determined that the defendant, a Jamaican, had been deprived of the right to a fair trial, despite the fact that defense counsel had not raised an objection at trial, because the prosecutor made references to the fact that the retail drug market in Washington D.C. had been taken over by Jamaicans, thereby suggesting that it was more likely that the defendant was guilty of the drug sales with which he had been charged. Although the government argued that these references were "fleeting" and "insignificant," the Court concluded that the "fairness, integrity [and] public reputation of judicial proceedings" were "seriously affected." *Id.* at 26.[3] Similarly, in *United States v. Cabrera*, 222 F.3d 590 (9th Cir. 2000), the Court found that the government's references to the drug market falling under the control of Cuban dealers, its suggestion that the Cubans were flight risks, and its description of

---

3. Although this case was decided before *United States v. Olano*, 507 U.S. 725 (1993), which laid out the plain error standard we employ here, the *Doe* panel appears to have employed substantially the same plain error test.

how Cubans tended to package their drugs, were plain error where defendant was also Cuban. *See also Withers v. United States*, 602 F.2d 124, 125 (6th Cir. 1979)(holding that prosecutor's reference to the fact that "not one white witness" has produced contradictory evidence was plain error).

While we find the government's mention of Hakim's religion disturbing, we conclude that Hakim cannot demonstrate that it amounted to plain error. This is primarily because the government offers a plausible explanation for why it made these references to Hakim's faith: it wanted to demonstrate that Boone respected Hakim and had no incentive to lie about his identification. The fact that the government offered this permissible explanation and that it never directly drew the link between Hakim's faith and the events of 9/11 distinguish this case from *Doe* and *Cabrera*, in which the government offered no such explanation and drew direct links between the defendants' race or ethnicity and the crimes with which they were charged.

To meet his burden on plain error review, Hakim would have to show that the government's actions "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings," *Johnson v. United States*, 520 U.S. 461, 467 (1997)(quoting *United States v. Young*, 470 U.S. 1, 15 (1985)), a showing difficult to make when there is a permissible explanation for the government's conduct. He has not made it here, hence we are constrained to reject Hakim's contention that these actions violated his right to a fair trial.

Despite so holding, we note that the government's explanation for its references to Hakim's faith, and even more so for its showing the jury Hakim's passport to demonstrate that he had traveled to Saudi Arabia, is by no means compelling. We do not reverse given the plain error standard of review, but we are troubled that the government, by making the references so soon after 9/11, needlessly made this case close.

The judgment of the District Court will be affirmed.

17

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*