698 S.E.2d 561

**Angle Joe Perrie VASQUEZ, a/k/a/ Angle Joe Perrie Vazquez, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 26852.

Supreme Court of South Carolina.

Heard March 17, 2010.

Decided Aug. 9, 2010.

Rehearing Denied Sept. 22, 2010.

450

Senior Appellate Defender Joseph L. Savitz, III, and Appellate Defender Elizabeth A. Franklin–Best, of South Carolina Commission on Indigent Defense, of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh and Assistant Deputy Attorney General Donald J. Zelenka, of Columbia, for Respondent.

Justice BEATTY:

In this post-conviction relief (PCR) case, Angle Joe Perrie Vazquez (Petitioner) petitioned this Court for a writ of certiorari to review the PCR judge's denial of his request for relief from his convictions and capital sentence. We granted the writ of certiorari to review whether trial counsel was ineffective in failing to object to comments made by the solicitor in which he: (1) referred to Petitioner, a Muslim, as a "domestic terrorist" and drew a correlation between Petitioner's indicted conduct and the events of September 11, 2001; and (2) urged jurors to imagine the fear and terror of one of the murder victims. We reverse and remand for a new sentencing hearing.

# I.  FACTUAL/PROCEDURAL HISTORY

## A.

The charges for which Petitioner was indicted arose out of the following facts established during the guilt phase of his trial.  On March 26, 2002, Joey Williams, the manager of a Burger King in Myrtle Beach, fired Petitioner for using profanity in front of a patron toward fellow employee Reginald Atkins.  Petitioner left the restaurant after being fired.  Employee Robbie Robertson was called in to complete Petitioner's shift.  In addition, Kuma Walker was on duty at the restaurant.

Atkins and Robertson testified that Petitioner and his cousin, Michael Keith Howard, returned to the restaurant as they were preparing to close for the evening.  Petitioner then pulled out a gun and ordered them to get into the restaurant's freezer.  Petitioner locked the two in the freezer.  After about five minutes, Atkins and Robertson forced their way out of the freezer and fled through the back door.

Concerned about Williams and Walker, Atkins returned to the Burger King and discovered that they had been shot and killed.  When investigating the scene, the police discovered that $737 had been stolen from the restaurant.  The police also found nine-millimeter shell casings and live nine-millimeter ammunition.  Ballistic analysis revealed that the bullets that killed Williams and Walker were fired from a nine-millimeter pistol that was linked to Petitioner.

At the conclusion of the trial, the jury convicted Petitioner of two counts of murder, four counts of kidnapping, one count of armed robbery, and one count of criminal conspiracy.

## B.

In the penalty phase, the State sought to establish the following statutory aggravating factors before the jury:  (1) the murder was committed while in the commission of a kidnapping;  (2) the murder was committed while in the commission of a robbery while armed with a deadly weapon;  and

(3) two or more persons were murdered by the Petitioner by one act or pursuant to one scheme or course of conduct.[1]

After outlining Petitioner's prior record, the State presented the testimony of SLED Agent Stephen Derrick, an expert witness who reviewed the crime scene reconstruction material, crime scene photographs, and autopsy photographs. Based on this information, Agent Derrick opined that Kuma Walker was shot first and then Joey Williams. He further testified that the shots were not random given both victims were shot in the head.

In response, Petitioner's trial counsel offered evidence as to the following mitigating circumstances: (1) Petitioner had no significant history of prior criminal convictions involving the use of violence against another person; and (2) Petitioner was an accomplice in the murder committed by another person and his participation was relatively minor.[2]

In addition to presenting evidence of Petitioner's background, trial counsel called Rasheed Kaleem Solom Mohammed to provide testimony regarding Petitioner's Muslim faith. Rasheed, an imam [3] for all Muslims incarcerated in South Carolina, testified he met Petitioner, a Sunni Muslim, and ultimately "appointed him as imam" at the J. Reuben Long Correctional Facility where he teaches other Muslim inmates. In discussing his and Petitioner's faith, Rasheed stated, "Ever since September the 11th we as Muslims have had it very, very, extremely hard."

During their closing arguments, the solicitor and trial counsel elaborated on this witness's testimony. The solicitor, who characterized Petitioner as a "domestic terrorist" during his opening guilt phase statements, drew a correlation between the events of September 11th and those for which Petitioner was charged. In response, trial counsel referenced the solicitor's use of the term "domestic terrorism" and attempted to counter the implications of this term.

---

1. S.C.Code Ann. § 16–3–20(C)(a)(1)(b), (a)(1)(d), (a)(9) (2003 & Supp. 2009).

2. S.C.Code Ann. § 16–3–20(C)(b)(1), (4) (2003 & Supp.2009).

3. Rasheed explained that an imam is "a teacher of Islam" who instructs other Muslims to read, speak, and write Arabic.

Following the solicitor's and his trial counsel's closing arguments, Petitioner made a statement to the jury in which he reiterated the evidence of his troubled background. He then specifically denied his guilt and explained to the jury his Muslim faith and attempted to discount the State's references to him as a terrorist and events of September 11th.

Ultimately, the jury found three aggravating factors and recommended the death penalty. The trial judge denied all of Petitioner's post-trial motions and ordered that Petitioner be put to death as a result of the conviction. Petitioner appealed his convictions and sentences to this Court.

This Court vacated the two life sentences for kidnapping with regard to the murder victims, but affirmed Petitioner's convictions and remaining sentences. *State v. Vazquez,* 364 S.C. 293, 613 S.E.2d 359 (2005), *abrogated in part by State v. Evans,* 371 S.C. 27, 637 S.E.2d 313 (2006) (recognizing error preservation requirements after *State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991) for challenging mitigation jury charges during a capital sentencing proceeding).

## C.

Subsequently, Petitioner filed a PCR application in which he raised thirty-six allegations of counsel's ineffectiveness. In an amended application, Petitioner's PCR counsel requested Petitioner be granted a new sentencing hearing on the grounds trial counsel was ineffective in two respects: (1) failing to object to the solicitor's improper "Golden Rule" argument wherein he appealed to the jury's bias by asking them to imagine themselves in the place of the victims; and (2) failing to object when the solicitor referred to the tragic events of September 11th during his closing in the penalty phase at trial, implying that Petitioner deserved the death penalty because he was a fanatic terrorist and a practicing Muslim who inspired fear across the country.

At the hearing, one of Petitioner's trial attorneys admitted he should have objected to the solicitor's "domestic terrorist" comment during his opening statement of the guilt phase. He believed his failure to object was "double prejudice" because Petitioner's September trial occurred during the second anniversary of September 11th and Petitioner was a Muslim. He

further explained, "[A]t [this] time ... the whole country was sort of upset with Muslims;" "they didn't have good Muslims and bad Muslims," most people thought "all Muslims were bad" based on the events of September 11th. He testified the jurors knew Petitioner was a Muslim because he wore a traditional Muslim prayer cap throughout the trial. Although he could not definitively testify that the solicitor's comments affected the jurors, he felt "the atmosphere at the time was charged with ... Muslim hatred."

Petitioner's other trial attorney conceded that he should have objected to the solicitor's reference to the events of September 11th during closing argument in the sentencing phase. He believed in retrospect that the argument could be perceived as inappropriate given the solicitor initially called Petitioner a "domestic terrorist" and the jury clearly knew Petitioner was a Muslim based on his attire and his choice of mitigation witnesses.

PCR counsel also called Dr. Nick DePhillips, an expert in clinical and neuropsychology, who testified regarding his research on psychological issues after September 11th. According to Dr. DePhillips, a study revealed that when the term "terrorist" is used in a conversation about Muslims, the people interviewed "have more negative views of Muslims." Dr. DePhillips opined the solicitor's use of the word "domestic terrorist" would have inferred to the jury that "this is a person who ... had a plan to ... hurt society in the same way as the people who ... planned and took out the 9/11 attacks." He believed that once the solicitor used the term "terrorist," the negative connotations associated with that term could not be removed.

To explain the comments in the context of the trial, PCR counsel called the solicitor who prosecuted Petitioner. He testified he intentionally used the term "domestic terrorist," referenced the events of September 11th, and asked the jury to imagine the final moments of Williams' life. In terms of the "domestic terrorist" comment and the September 11th reference, he admitted that he knew Petitioner was Muslim, but nevertheless, believed these comments were a "fair characterization" of Petitioner's actions during the crimes. He believed the jury could have interpreted the term "terrorist" in the

general sense that Petitioner "struck fear in the hearts of innocent people." He further explained that the September 11th reference "made a very valid point" and was "sort of the introductory story for the victim impact testimony." He acknowledged that his request for the jury to imagine the final moments of Williams' life could be construed as "objectionable." He, however, testified his purpose in making this argument was to give the jury "some sense of the fear and the terror that . . . Joey Williams inevitably experienced."

Following the hearing, the PCR judge issued an order in which he dismissed Petitioner's application in its entirety. Although the PCR judge rejected each of Petitioner's allegations of ineffective assistance of counsel, he specifically found trial counsel was deficient in failing to object to: (1) the solicitor's improper "Golden Rule" argument where he appealed to the jury's bias by asking them to imagine themselves in the place of the victim; and (2) the solicitor's closing argument reference to the events of September 11th. However, the judge concluded Petitioner was not prejudiced by his counsel's deficient performance.

In terms of trial counsel's failure to object to the "Golden Rule" argument, the PCR judge concluded that "the brief reference to 'imagine the terror' and horror in the prosecution['s] closing statement did not undermine the confidence in the outcome" of the trial. Essentially applying a harmless error analysis, the judge reasoned that Petitioner had killed two known friends and co-workers "in execution style." The judge also stated that Petitioner had a history of refusing to obey correctional officers and a history of criminal domestic violence.

With respect to trial counsel's failure to object to the solicitor's use of the term "domestic terrorist" and reference to the events of September 11th, the judge determined that the deficient performance was not prejudicial given it "did not undermine confidence in the outcome" of the penalty phase. The judge reasoned that "the comments were not a call to arouse the passion and prejudice of the jury nor equate [Petitioner] as a member of the 9–11 terrorist[s]." The judge further found the solicitor's comments were not "anti-Muslim." Instead, he concluded the comments were an "acceptable

argument" which was "figurative speech concerning victim impact evidence generally."

This Court granted Petitioner's request for a writ of certiorari to review the decision of the PCR judge.

## II. DISCUSSION

### A.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lomax v. State*, 379 S.C. 93, 665 S.E.2d 164 (2008).

The United States Supreme Court has established a two-pronged test to establish ineffective assistance of counsel by which a PCR applicant must show (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Cherry v. State*, 300 S.C. 115, 386 S.E.2d 624 (1989). Under the second prong, the PCR applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." *Simmons v. State*, 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998).

This Court will uphold the findings of the PCR judge when there is any evidence of probative value to support them, and will reverse the decision of the PCR judge when it is controlled by an error of law. *Suber v. State*, 371 S.C. 554, 558–59, 640 S.E.2d 884, 886 (2007).

### B.

Petitioner contends trial counsel's failure to object to the solicitor's opening statement during the guilt phase, in which he described Petitioner as a "domestic terrorist," and his closing argument at sentencing, in which he drew a correlation between the events of September 11, 2001, and the acts for which Petitioner was standing trial constituted deficient per-

formance. Given the solicitor's "egregiously prejudicial" comments during the capital trial, Petitioner asserts the PCR judge erred in not finding Petitioner was denied effective assistance of counsel. Based on this assertion, Petitioner requests this Court reverse his convictions and sentence of death.

In the first sentence of his opening statement to the jury during the guilt phase of the trial, the solicitor stated, "Ladies and gentlemen, this is a case about a domestic terrorist." Prior to informing the jury about Petitioner's charges, the solicitor again stated, "This case is about a domestic terrorist."

In his closing argument to the jury during the penalty phase, the solicitor made the following reference to the events of September 11th:

> I was—I guess this was several weeks ago.... It was in September. It was right before the 11th. I was watching a news show and former New York mayor, Rudy Giuliani, was being interviewed and they were talking to him about—9/11 was coming up, the second anniversary of 9/11 was coming up—and they're talking to him about his experiences and ... he was talking to this reporter about the things that happened that day and that he was actually very close to ground zero after the first plane hit and then he got out of there.... [H]e talked about so many of his friends, personal friends and acquaintances and co-workers with the City of New York that were killed in the attack, and he talked about his secretary who was—had been with him for 20 years.... [T]hey were, you know, very, very, very close friends, and he talked about on 9/11 how his secretary came in and he had to tell her that her husband had been killed in one of the towers, and during and just hours after the attack, and he concluded his discussion and his interview about this, he said, you know, "Now I have—before 9/11 I had one life, but now I have two lives," ... "I have my life before September 11th of 2001, and I have my life after September 11th, 2001."

In this case, folks, the friends and family of Joey Williams and Kuma Walker have two lives. They have their life before March 26th, 2002. They have their life after March 26th, 2002. It's appropriate, it's proper for you to consider

the impact of this crime on the family and friends of Kuma Walker and Joey Williams.

■■■■ A solicitor's closing argument must be carefully tailored so as not to appeal to the personal biases of the jury. *State v. Copeland*, 321 S.C. 318, 324, 468 S.E.2d 620, 624 (1996). The State's closing arguments must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence. *Id.* "A solicitor has a right to state his version of the testimony and to comment on the weight to be given such testimony." *Randall v. State*, 356 S.C. 639, 642, 591 S.E.2d 608, 610 (2004). However, "[s]olicitors are bound to rules of fairness in their closing arguments," as we have explained:

> While the solicitor should prosecute vigorously, his duty is not to convict a defendant but to see justice done. The solicitor's closing argument must, of course, be based on this principle. The argument therefore must be carefully tailored so as not to appeal to the personal bias of the juror nor be calculated to arouse his passion or prejudice.

*State v. Northcutt*, 372 S.C. 207, 222, 641 S.E.2d 873, 881 (2007) (quoting *State v. Linder*, 276 S.C. 304, 312, 278 S.E.2d 335, 339 (1981)).

■■■■ "On appeal, the appellate court will view the alleged impropriety of the solicitor's argument in the context of the entire record, including whether the trial judge's instructions adequately cured the improper argument and whether there is overwhelming evidence of the defendant's guilt." *Simmons*, 331 S.C. at 338, 503 S.E.2d at 166. "Improper comments do not automatically require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument." *Humphries v. State*, 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). "The relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.; see State v. Hornsby*, 326 S.C. 121, 129, 484 S.E.2d 869, 873 (1997)("A denial of due process occurs when a defendant in a criminal trial is denied the fundamental fairness essential to the concept of justice.").

Although we agree with the PCR judge's conclusion that trial counsel was deficient in failing to object to the above-referenced comments, we find the PCR judge erred in finding Petitioner was not prejudiced by this deficient performance. As will be more thoroughly discussed, we hold the solicitor's comments so infected the trial with unfairness as to make the resulting death sentence a denial of due process.

As a threshold matter, Petitioner's case was clearly not one that constituted "terrorism" by the legal sense of the word. Significantly, our General Assembly has promulgated a specific statutory scheme related to terrorist acts within this state. S.C.Code Ann. §§ 16–23–710 to –770 (2003 & Supp.2009). As defined by this Act, Petitioner's indicted conduct did not come within the purview of this statute.[4]

Given the solicitor's depiction of Petitioner as a domestic terrorist was without legal support, trial counsel was deficient in failing to object on this ground. Furthermore, it is indisputable that the term "terrorist," even in the general sense, can only conjure negative connotations. Thus, the solicitor's use of the term was clearly improper because there was no evidentiary basis to support this characterization. *See* Thomas M. Fleming, Annotation, *Negative Characterization or Description of Defendant, by Prosecutor During Summation of Criminal Trial, as Ground for Reversal, New Trial, or Mistrial—Modern Cases,* 88 A.L.R.4th 8, § 28 (1991 & Supp. 2009) (discussing differing results of cases where prosecutor characterized the defendant in closing argument as a "terror" or "terrorist"); *cf. Hernandez v. State,* 114 S.W.3d 58, 64 (Tex.Ct.App.2003) (finding solicitor's penalty phase argument that equated defendant to a terrorist did not violate defendant

---

4. Section 16–23–710(18) of the South Carolina Code states that "terrorism" includes activities that:
   (a) involve acts dangerous to human life that are a violation of the criminal laws of this State;
   (b) appear to be intended to:
      (i) intimidate or coerce a civilian population;
      (ii) influence the policy of a government by intimidation or coercion; or
      (iii) affect the conduct of a government by mass destruction, assassination, or kidnapping; and
   (c) occur primarily within the territorial jurisdiction of this State.
   S.C.Code Ann. § 16–23–710(18) (Supp.2009).

rights because the term "terrorism" is generally defined as "the act of terrorizing; use of force or threats to demoralize, intimidate, and subjugate" and the evidence established defendant committed the crime to advance in the hierarchy of a gang; therefore, the prosecutor's statements were merely a summation of the evidence in the case).

Although this Court on several occasions has found no reversible error in a solicitor's singular inflammatory characterization of a defendant,[5] we find the solicitor's comments in the instant case clearly exceeded the bounds this Court has established with respect to this type of comment. Here, the inflammatory term characterizing Petitioner, a Sunni Muslim, as a "domestic terrorist" was intentionally used in conjunction with the solicitor's extensive reference to the events of September 11, 2001. We find the solicitor's statements improperly evoked religious prejudice and, thus, served only to inflame the passions and prejudice of the jury. *Cf. Toyota of Florence, Inc. v. Lynch,* 314 S.C. 257, 442 S.E.2d 611 (1994) (holding "vicious, inflammatory" closing argument that evoked racial prejudice was a flagrant case warranting a new trial).

Having determined the solicitor's comments were improper, the question becomes whether trial counsel's failure to object to these comments prejudiced Petitioner and, in turn, denied him effective assistance of counsel.

As recognized by the PCR judge, this is a novel issue in this state and has only been addressed to a limited extent in other jurisdictions. A number of appellate decisions, which were cited by the PCR judge, have held references to the events of

**5.** *See, e.g., State v. Bennett,* 369 S.C. 219, 231–32, 632 S.E.2d 281, 288–89 (2006) (recognizing, in capital case, that the terms "blond lady" and "King Kong," could have racial connotations, but finding solicitor's use of these terms "descriptive of Appellant's size and strength as they related to his past crimes" and were not made to inflame the passions or prejudices of the jury; concluding term "Caveman" was not inflammatory given it was "merely descriptive of two of Appellant's past violent incidents"); *Randall v. State,* 356 S.C. 639, 591 S.E.2d 608 (2004) (holding that prosecutor's likening of defendant as "cockroach" during closing argument did not so infect trial as to deny defendant due process); *State v. Lee,* 269 S.C. 421, 237 S.E.2d 768 (1977) (concluding prosecutor's reference to defendant as a "menace to society" could not be considered prejudicial since that concept forms the very basis for crimes involving moral turpitude).

September 11th did not constitute reversible error; however, these cases do not establish a definitive rule on this issue. Instead, these decisions merely provide guidance given the significant factual distinctions from Petitioner's capital case.

Unlike Petitioner, none of the defendants in the cited cases was Muslim. Here, Petitioner's Muslim faith was a key theme throughout the trial proceedings which coincided with the second anniversary of September 11th.

Even before the inception of the trial, the jurors were apprised that Petitioner was a Muslim. Apparently concerned with the jurors' perception of Petitioner, trial counsel questioned potential jurors during *voir dire* as to whether Petitioner's Muslim faith would affect their decision. At the beginning of the penalty phase, counsel explained to the jury about Petitioner's Muslim beliefs and the fact that Petitioner wore a "traditional Muslim headdress" during the trial. During his penalty phase closing argument, trial counsel also referenced the solicitor's use of the term "domestic terrorism" and attempted to counter the implications of such a term.

Petitioner also affirmatively reinforced his Muslim faith to the jury: by wearing a traditional Muslim prayer cap during trial; calling his "brother" Rasheed as a mitigation witness; and giving a statement to the jury in which he explained his Muslim faith and attempted to counter what he perceived to be the State's attempt to disparage his Muslim faith. Notably, even one of the State's witnesses during the penalty phase made reference to Petitioner as a Muslim.

Thus, in the context of the entire record, the solicitor's characterization of Petitioner, a Muslim, as a "domestic terrorist" and the direct correlation between Petitioner's indicted conduct and the events of September 11th can only be deemed prejudicial as confirmed by the expert witness called by Petitioner during the PCR hearing. *See State v. Millsaps,* 169 N.C.App. 340, 610 S.E.2d 437 (2005) (holding defendant was entitled to a new trial where the prosecutor in closing compared defendant's acts to those of the September 11th terrorists); *cf. United States v. Hakim,* 344 F.3d 324, 333 (3rd Cir.2003) (finding government's mention of defendant's Muslim religion "disturbing," but concluding no plain error given government offered a permissible explanation for why it made

these references to defendant's faith and "never directly drew the link between [defendant's] faith and the events of 9/11").

Additional support for this conclusion may be found in the analogous case of *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002). In *Jones*, the defendant was convicted of first-degree murder and sentenced to death. On direct appeal, the North Carolina Supreme Court affirmed the defendant's conviction, but reversed his sentence of death and remanded for a new sentencing proceeding based on the prosecutor's improper closing argument. Over the defendant's objection, the prosecutor referenced the Columbine school shootings and the bombing of the Oklahoma City federal building. Specifically, he stated:

> The United States of America, a great country, indeed [known] around the world for its freedoms: freedom of speech, freedom of privacy in your own home. But with those freedoms comes individual responsibility that every citizen of this country must realize; that to have these freedoms, one is responsible for their [sic] own conduct; one is responsible for their [sic] own behavior.
>
> A year ago the Columbine shootings; five years ago Oklahoma City bombings. When this nation faces such tragedy—[the defendant's objection overruled]—the laws of this country come in to bring order to that tragedy, to speak to that tragedy. Here we are addressing a tragedy of a man's life. The tragedy not of this defendant, the tragedy of the [the victim] . . .

*Id.* at 107. In interpreting these remarks, the North Carolina Supreme Court stated that such remarks could not be "construed as anything but a thinly veiled attempt to appeal to the jury's emotions by comparing defendant's crime with two of the most heinous violent criminal acts of the recent past." *Id.* The court found the argument was improper for at least three reasons: "(1) it referred to events and circumstances outside the record; (2) by implication, it urged jurors to compare defendant's acts with the infamous acts of others; and (3) it attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice." *Id.* Finally, the court determined that the defendant was prejudiced by these remarks given "[t]he impact of the statements in question, which conjure up images of disaster and tragedy of epic

proportion, is too grave to be easily removed from the jury's consciousness, even if the trial court had attempted to do so with instructions." *Id.*

Similar to the comments in *Jones,* the solicitor's remarks in the instant case were clearly improper and indisputably prejudicial to Petitioner's case. Because there was no legal or evidentiary support for the solicitor's use of the term "domestic terrorist," the comments invoked circumstances outside of the record. Furthermore, by verbally drawing a direct correlation between Petitioner's acts and the events of September 11th, the solicitor appealed to the jurors' sense of passion and prejudice involving anti-Muslim sentiment. Additionally, given that trial counsel did not object, there was no opportunity for the trial judge to even attempt to cure the error.

Based on the foregoing, we find there is a reasonable probability that trial counsel's failure to object to the solicitor's comments affected the jury's deliberation of Petitioner's sentence of death. *See Von Dohlen v. State,* 360 S.C. 598, 613, 602 S.E.2d 738, 746 (2004) ("It is difficult to determine the precise impact of the solicitor's argument on the jury's deliberation of the sentence, but the potential impact must be carefully and thoroughly evaluated in a capital case."); *State v. McClure,* 342 S.C. 403, 409, 537 S.E.2d 273, 275 (2000) ("We note the evaluation of the consequences of an error in the sentencing phase of a capital case [is] more difficult because of the discretion that is given to the sentencing jury. A capital jury can recommend a life sentence for any reason or no reason at all."); *State v. White,* 246 S.C. 502, 507, 144 S.E.2d 481, 483 (1965) (noting that "[i]n view of the absolute discretion of the jury with regard to the issue of mercy, it is impossible to determine whether the argument actually had a prejudicial effect upon the verdict").

Because the solicitor's comments were primarily confined to the penalty phase and not the guilt phase of Petitioner's trial, we hold they do not warrant a reversal of his convictions. Instead, a finding of ineffective assistance of counsel only entitles Petitioner to a new sentencing hearing.

Admittedly, the facts of this case are horrific and there is overwhelming evidence of Petitioner's guilt. Moreover, we are cognizant of this Court's decisions finding that counsel's

deficient performance in a death penalty case did not warrant reversal where the error did not contribute to the verdict.[6] However, the sheer weight of the evidence in the instant case does not negate the prejudicial impact of the solicitor's improper comments.

As previously described, the solicitor intentionally and unnecessarily injected religious prejudice into Petitioner's trial. Because we are bound to uphold the integrity of this state's court proceedings, we cannot condone the deliberate use of religious prejudice during a trial. Accordingly, we must necessarily conclude that trial counsel's failure to object to the solicitor's remarks was prejudicial to Petitioner. *See Simmons*, 331 S.C. at 340, 503 S.E.2d at 167 (stating that "because the issue is whether the solicitor's improper argument prevented the jury from fairly considering the guilty with a recommendation of mercy verdict, the overwhelming evidence of petitioner's guilt does not eliminate the reasonable probability that the result of the trial would have been different had trial counsel objected to portions of the solicitor's closing argument").[7]

## III.

In conclusion, we hold Petitioner's trial counsel was deficient in failing to object to the solicitor's challenged remarks. Because the solicitor's characterization of Petitioner, a Muslim, as a "domestic terrorist" and correlation between Petitioner's acts and the events of September 11th was so egregious, Petitioner has proven he was prejudiced by counsel's deficient performance. Thus, the PCR judge erred in failing to find Petitioner was denied effective assistance of counsel. Given the solicitor's improper remarks occurred primarily during the penalty phase of Petitioner's trial, we find Petition-

---

**6.** *Cf. Arnold v. State/Plath v. State*, 309 S.C. 157, 420 S.E.2d 834 (1992) (finding, in capital case, trial counsel's failure to object to unconstitutional malice charge was harmless where, beyond a reasonable doubt, the error did not contribute to the verdict in light of the overwhelming evidence of malice).

**7.** In view of our holding as to Petitioner's first issue, we need not address Petitioner's remaining issue regarding the PCR judge's determination that Petitioner was not prejudiced by trial counsel's failure to object to the solicitor's "Golden Rule" argument.

er is only entitled to a new sentencing hearing and not a reversal of his convictions.

**REVERSED AND REMANDED.**

KITTREDGE, J., concurs. PLEICONES, J., concurring in result only.

TOAL, C.J., dissenting in a separate opinion in which HEARN, J., concurs.

Chief Justice TOAL.

I respectfully dissent. In my view, the PCR judge properly concluded Petitioner was not denied effective assistance of counsel, and I would affirm the PCR judge's denial of relief.

## I. Guilt Phase

In my opinion, the majority arrived at the correct result regarding the guilt phase of the trial. While I agree Petitioner is not entitled to a new trial, I do not agree with the majority that trial counsel was deficient or Petitioner was prejudiced by trial counsel's failure to object to the solicitor's "domestic terrorist" comment. However, even assuming those prongs are satisfied, I would find the overwhelming evidence of guilt established at trial precludes relief. *See Rosemond v. Catoe,* 383 S.C. 320, 325, 680 S.E.2d 5, 8 (2009) (holding PCR applicant not prejudiced by trial counsel's performance because evidence of guilt was overwhelming).

## II. Sentencing Phase

As to the sentencing phase, I disagree with the majority that trial counsel was deficient or Petitioner was prejudiced by the solicitor's comments regarding September 11, 2001.

In my view, the solicitor's statement regarding September 11, 2001 simply was reference to an historical event, not an attempt to inflame the passions and prejudices of the jury. The PCR judge found the statement an acceptable introduction to the victim impact evidence. I agree with the PCR judge. During his speech, the solicitor mentioned September 11, 2001 as a tragic, life-changing historical event. The solicitor's remark, despite the majority's characterization, was not

religious in nature or directed at Petitioner's Muslim faith.[8] He did not call attention to any racial or religious aspect of that event, and he did not liken Petitioner to the attackers. The solicitor focused on the before-and-after effects on an individual who suffers a sudden, tragic loss of a loved one. Therefore, in my opinion, the solicitor's comments were not improper, and I would hold counsel was not deficient for failing to object.

Even assuming trial counsel were deficient for failing to object to the solicitor's closing argument, I do not believe the solicitor's comments so infected the proceedings with unfairness that Petitioner was denied due process. A solicitor's statements must be viewed in the context of the entire record. *Smith v. State*, 375 S.C. 507, 523, 654 S.E.2d 523, 532 (2007). Appellant has the burden of proving he did not receive a fair trial because of the alleged inappropriate comments. *Simmons v. State*, 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998). The relevant question is whether those comments so infected the proceedings with unfairness so as to make the result a denial of due process. *Id.* Improper comments do not require reversal if they are not prejudicial. *Id.*

The majority first finds that counsel was deficient, and then discusses the egregiousness of the solicitor's comments. From there, the majority presumes prejudice from the comments regarding September 11, 2001, stating they are "so egregious" there is no possibility they did not affect the jury's sentence of death.[9] This approach creates a *per se* rule of prejudice and ignores the well-established analytical framework for PCR cases. Our PCR jurisprudence is clear that the

8. The majority indicates the solicitor's comments are so egregiously prejudicial because they "intentionally and unnecessarily injected religious prejudice into Petitioner's trial." However, as the majority details, Petitioner repeatedly raised the issue of his religious faith at various stages of the trial, making his religion a theme throughout the trial. The solicitor did not invoke Petitioner's religion at any point during either phase of the trial. Thus, in my view, the majority's assertion that the solicitor introduced any supposed religious prejudice with his comments is unfounded.

9. The majority appears to find that the solicitor's reference to September 11, 2001 is not *per se* prejudicial by itself, but rather the prejudice results when the comments are coupled with the fact Petitioner is Muslim.

PCR applicant must prove the allegations in his petition. *Butler v. State,* 286 S.C. 441, 442, 334 S.E.2d 813, 814 (1985). To establish prejudice, Petitioner must show a reasonable probability the result of the proceeding would have been different but for trial counsel's deficiency. *Cherry v. State,* 300 S.C. 115, 117–18, 386 S.E.2d 624, 625 (1989). Therefore, to demonstrate prejudice in this case, Petitioner must prove a reasonable probability exists that a jury would not have sentenced him to death if trial counsel had objected to the solicitor's comments. In my view, Petitioner has not met his burden of proving prejudice.

In *Arnold v. State/Plath v. State,* 309 S.C. 157, 420 S.E.2d 834 (1992), a combined death penalty PCR appeal, this Court said that to find harmless error, a court must find that error "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." That case concerned a constitutionally improper burden-shifting jury charge. This Court evaluated all the evidence and found beyond a reasonable doubt that the improper jury charge could not have affected the verdict; thus the improper charge was harmless error.

Similarly, in the instant case, I would find any alleged error is unimportant in relation to everything else the jury considered. First, overwhelming evidence of Petitioner's guilt was established during the guilt phase of the trial. Second, three statutory aggravating factors were established during the sentencing phase: (1) the murder was committed while in the commission of a kidnapping; (2) the murder was committed while in the commission of a robbery while armed with a deadly weapon; and (3) two or more persons were murdered by Petitioner by one act or pursuant to one scheme or course of conduct. Third, there are no relevant statutory mitigating factors.[10] Thus, following this Court's earlier decision in

---

10. Petitioner did present evidence of two mitigating factors: (1) no significant prior criminal history involving violence; and (2) Petitioner was an accomplice whose participation was relatively minor. However, the facts of the crime do not support these mitigating factors. After having been fired for using obscenities at a customer, Petitioner recruited his cousin, armed himself, and returned that evening to the restaurant. At gun-point, Petitioner kidnapped and imprisoned two employees in the restaurant's cooler. Those employees escaped. Petitioner

*Arnold v. State/Plath v. State,* I would find the weight of evidence against Petitioner and the utter lack of mitigating circumstances demonstrate there is no reasonable probability the solicitor's comments influenced the jury's sentence of death.

Therefore, in my opinion, in light of the overwhelming evidence of guilt established at trial and the statutory aggravating factors, there is no reasonable probability that the jury would not have recommended the death penalty but for the solicitor's comments, and I would affirm the PCR judge's denial of relief.

### III. Golden Rule Argument

The majority does not address Petitioner's Golden Rule argument because it reverses the PCR court's denial of relief on other grounds. Because I would affirm the PCR court on those grounds, I address Petitioner's remaining argument.

Petitioner argues the solicitor made an improper Golden Rule argument in his closing of the sentencing phase by asking the jurors if they could imagine the terror and horror the victims experienced in their final moments of life. I disagree, and would find the solicitor's statements were appropriate references to victim impact statements. The references did not encourage the jury to depart from neutrality and decide the case on personal interest or bias rather than the evidence presented. *See State v. Reese,* 370 S.C. 31, 633 S.E.2d 898 (2006) (finding improper Golden Rule argument when solicitor asked the jury to speak for the victim through its verdict); *Von Dohlen v. State,* 360 S.C. 598, 602 S.E.2d 738 (2004) (finding solicitor's comments asking jurors to put themselves in victim's shoes was an improper Golden Rule argument). Furthermore, even if the solicitor did make an improper Golden Rule argument, I would find the error harmless in light of the enormity of the evidence against Petitioner, the

---

then brought the store manager and another employee into the cooler, where he repeatedly shot each victim "execution style" in the back of the head. He then left with over one thousand dollars from the cash register and went directly to a nearby strip club. I would find the sheer cold brutality of this crime outweighs Petitioner's lack of prior criminal violence. Further, the second mitigating factor simply cannot be proven in light of the guilty verdict.

presence of three statutory aggravating factors, and the absence of any factors in mitigation.

HEARN, J., concurs.