STATE OF NORTH CAROLINA v. DALE HOWARD MILLSAPS, Defendant

No. COA04-627

(Filed 5 April 2005)

**Criminal Law— insanity defense—prosecutor's improper arguments**

The trial court abused its discretion in a prosecution for first-degree murder and other offenses by overruling defendant's objections to the prosecutor's improper and prejudicial remarks during closing arguments, and defendant is entitled to a new trial, because: (1) the prosecutor argued outside the evidence presented that it was 99 percent certain a judge someday can and will say release defendant, and the remark impermissibly indicated that defendant would likely be released after a very short period of time if he was found not guilty by reason of insanity; (2) the comparison of defendant's acts to those of the September 11 terrorists, which had occurred only a little over a year earlier, appealed to the jury's sense of passion and prejudice by comparing defendant's acts to infamous events outside the record; and (3) it cannot be said beyond a reasonable doubt that the improper and prejudicial arguments by the prosecutor, which were neither checked nor cured by the trial court, did not contribute to defendant's conviction.

Appeal by defendant from judgment entered 21 November 2002 by Judge James U. Downs in Graham County Superior Court. Heard in the Court of Appeals 14 February 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Robert C. Montgomery, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant was indicted upon charges of first-degree murder, felonious breaking and entering, assault with a deadly weapon with intent to kill inflicting serious injury, and three counts of assault with a firearm on a law enforcement officer. He entered pleas of not guilty and gave notice of his intent to rely upon the defense of insanity.

The evidence at trial tended to show that on 25 November 2001, at 6:37 a.m., an "all officer" page was issued from the Sheriff's dispatcher after receiving a call from defendant. Defendant told the dispatcher he had been in a night-long battle with his neighbors and friends, Doug and Margaret Wilson. Defendant reported that the Wilsons had been shooting at him from under his trailer, and that he shot back and killed them.

Deputy David Styles was the first officer to arrive at the scene. When he asked defendant where the people were who had been shot, defendant answered, "They're under the floor." Deputy Styles noticed a revolver stuck in defendant's pants and asked defendant to put the gun away. Defendant replied, "I'm in my own house, you just back up." After Deputy Steve Lovelace arrived, he and Deputy Styles searched around and under the trailer but found no bodies under the trailer or any blood trails.

Graham County Sheriff Steve Odom arrived at the scene at 6:46 a.m. When Sheriff Odom called defendant from his cell phone to try to talk him out of the trailer, defendant repeated the story of the shootout, telling Odom he knew he had killed the Wilsons. Margaret Wilson was contacted at home by phone and she assured the officers that there had not been a shootout and that she and her husband were fine. Sheriff Odom told everyone to leave except Deputy Lovelace who was positioned about 100 yards away from the trailer to continue surveillance.

Sheriff Odom was aware of an earlier incident, occurring on 17 November 2001, when defendant had reported that his brother, Homer, had been shot. When Graham County Deputy Sheriff Danny Millsaps arrived, defendant stepped out from behind the bushes with

a shotgun, saying, "Homer's been shot, somebody shot my brother." After defendant put down the shotgun, he and Deputy Millsaps found Homer inside his house slumped over in a chair, intoxicated. Sheriff Odom testified that on this same day, defendant shot out two windows at his home. Shortly thereafter, Homer Millsaps stopped by Sheriff Odom's office to find out about getting his brother committed. Homer and his mother were concerned about defendant and wanted to get him help. Knowing this history, Sheriff Odom left the scene the morning of 25 November to obtain a commitment order from the magistrate. He then contacted the prosecutor and a State Bureau of Investigation agent to determine the best course of action to get defendant out of his trailer.

At approximately 8:50 a.m., Deputy Billy Orr relieved Deputy Lovelace from his duty. Deputy Orr contacted Sheriff Odom at 9:11 a.m., telling him that defendant, wearing a camouflage jacket and carrying a shotgun, had left his trailer and was walking in the direction of the residence of Kenneth and Mildred Garrison. After Deputy Orr saw defendant go into the woods between his residence and that of the Garrisons, Sheriff Odom directed him to follow at a safe distance but to try to keep defendant in his sight.

The Garrisons, who lived in a double-wide mobile home about 150 yards from defendant's residence, were at their home that morning with their two sons, Jason, age 14, and Joseph, age 10. Defendant entered the residence; Kenneth was in his chair in the den, Mildred was in the master bedroom and the boys were in Jason's bedroom. Mildred heard a series of loud bangs. She opened the bedroom door and saw Kenneth staggering in the hall "with the whole side of his face shot off" and someone following behind him in a camouflage coat. She fled to the bathroom and locked the door just as a projectile came through and struck her in the arm. She screamed loudly and then became quiet so the shooter would think she was dead.

After she heard the intruder leave the house, Jason called to her. Jason and Joseph came into the bathroom with her to hide until they could get help. Kenneth Garrison had three close-range shotgun wounds and three single-shot wounds. He died as a result of these wounds. Mildred Garrison had a single gunshot injury to her arm.

Deputy Orr, who had lost sight of defendant, pulled into the Garrison's driveway, having heard gunshots coming from that direction. Sheriff Odom and another officer pulled in just seconds later. Defendant, who was outside the Garrison home, fired at the

officers with a shotgun and pistol. Sheriff Odom returned fire, and defendant was felled after being wounded twice in the abdomen and once in the arm.

Defendant presented evidence that he suffered from psychotic symptoms. In the ambulance, defendant volunteered he was "Nicodemus, a disciple of Jesus Christ." Lisa Edwards, a nurse at the Mission-St. Joseph Health Care Center, testified that she assessed defendant upon his arrival. He stated to her that "he has been dead for days," and that he had been trying all week to kill a person who had poisoned his water.

Dr. James E. Bellard, a forensic psychiatrist, testified that defendant "was so mentally ill that he could not distinguish right from wrong." He diagnosed defendant as having depression with psychotic features. Dr. James Baird Payton, child/adult psychiatrist, also opined that defendant did not know right from wrong and that he was psychotic at the time of his evaluation of defendant on 26 November 2001. A psychologist from Winston-Salem, Dr. John Frank Warren, III, first evaluated defendant on 28 November 2001. He also diagnosed defendant as suffering from depression with psychotic features and believed defendant was not capable of distinguishing between right and wrong. Additional testimony from defendant's family and friends revealed psychotic statements by defendant that someone was trying to harm him and his belief that he could not be killed because he was wearing the armor of God.

The State presented rebuttal evidence by Dr. Jennifer Schnitzer, a forensic psychology fellow at Dorothea Dix Hospital, and Dr. Peter Barboriak, a forensic psychiatrist at Dix. Both witnesses testified to their opinions that defendant suffered from a psychotic disorder but that he knew the nature and quality of his actions and was aware of the wrongfulness of his actions.

A jury convicted defendant of first-degree murder, felonious breaking and entering, assault with a deadly weapon with intent to kill inflicting serious injury, and three counts of assault with a firearm on a law enforcement officer. He appeals.

I.

Defendant's appeal raises the issue of the propriety of the prosecution's closing argument. During his closing argument, the prosecutor reminded the jury that the defense did not contest the commission

of the acts charged, but relied on the defense of insanity. The prosecutor informed the jurors that for them to find defendant not guilty by reason of insanity, the defendant had to show that he was suffering from a defect of his mind and that "the disease must have so impaired his mental capacity that either he did not know the nature and quality of the act as he was committing it or if he did he did not know that that act was wrong." He continued:

> [PROSECUTOR]: I submit that in a way that they tempt you to take an easy way out. Mr. Melrose in his opening and indicated again in his closing, going back to his opening, he said this, "the family knows he will be in prison or a mental facility for as long as he lives," leading you to believe that regardless of what your verdict is that the result and an alternative is essentially the same. So, they bring up—I didn't bring it up, they bring up this business about commitment procedures that he talked to you about this afternoon.
>
> I want to point out one thing to you. You folks learned a lot about another type of commitment procedure, and that's this commitment where a person goes to the magistrate and says, you know, due to intoxication or mental defect that a person needs to be committed. And you heard my friend read out of the book, and we know exactly what the book says about how it's supposed to work but it plays out quite differently in the real world.
>
> I submit to you that when you look out and think about this commitment procedure, that there are only three things that are for certain if you say not guilty by reason of insanity, and Judge Downs issues this commitment, there's only three things that can be counted on.
>
> The first thing is that there will be a hearing in fifty days, and that hearing will be or can be contested. It can be a dog fight, maybe worse than a dog fight you've heard here the last week or two; that there can and probably will be attorneys involved, experts involved, arguments, the whole nine yards. That's one thing you can count on. In fifty days there will be a hearing.
>
> Number 2, the second thing you can count on, is—and the only thing that we know we can rely on is that a North Carolina Superior Court Judge will hear the matter. That means somebody that lives between Franklin and Manteo, that's the only thing that we know.

**STATE v. MILLSAPS**

[169 N.C. App. 340 (2005)]

The third thing that you know for certain is this; that once you come back tomorrow or the next day or next week or whenever it is and render your verdict that as of that moment this case, this situation, leaves your hands and is out of the hands of the citizens of Graham County forever; that is, the decision process what ultimately is done with this man. No say so. This trial is the last say so that you'll ever have.

I'm telling you this stuff not—members of the jury, I'm not saying find him guilty or not guilty or whatever because of this. You're not supposed to do that and I'm not supposed to ask you about it. I'm simply saying that I want you to have your eyes wide open, and I do not want you to be deceived.

I'll contend this; we don't think or contend necessarily that he's going to be back in our town or back out there life as usual at Tallulah in fifty or ninety days, but he could be. It's possible.

I submit this to you, it's almost 100 percent certain that because of what you know about the hearing that the defendant will have attorneys and more of these hired experts, and sure, they may have neutralized two potential experts, especially Bellard, by getting Bellard to say, I'd never recommend it. What about the other five or ten thousand experts across the country that are willing to do any kind of work for $300.00 an hour. There'll be experts, etc., that can say he's no longer a threat and he's under control and look at his age, look at how he acted like a choir boy during the trial, send him to mental health. Sure, as long as he's under medication he's okay, but he doesn't have to be down in Dix Hospital or over there around Central Prison to be fed medication. You heard one of the doctors say that he could be farmed out to local mental health and as long as they monitor him and make sure he takes his medication a Judge could say he's no longer a danger to himself or others.

We submit *it's 99 percent certain that Judge someday can and will say that, oh that conviction was six or eight or ten years ago, that's irrelevant, release him.* (Emphasis added).

MR. MELROSE: Your Honor, I object to that argument.

THE COURT: Overruled.

[PROSECUTOR]: All this, members of the jury,—we think this is a clear cut case, but all this is by way of meeting his goal, get out

STATE v. MILLSAPS

[169 N.C. App. 340 (2005)]

of here and get set free. Before you do that, before you do any-thing blindly, we simply want you to understand that. We simply want you to understand that. We don't want you to have any sur-prises down the road. Are there people who won't sleep if that happens? Possibly. I don't know.

But we submit there's certainly the possibility he may get out, mark my word, the 20th of November, 2002. Write it down there, somebody. There's that possibility and they can't guarantee that that won't happen.

So, I say all that to emphasize that you shouldn't be suckered in by what looks like an easy way out that will achieve the same result. Baloney, don't be lulled into a false sense of security. Don't think there's going to be equal protection either way by taking the easy way out or have your eyes wide open. Simply vote for responsibility on this evidence rather than excuses is what we would ask you to do. Vote for responsibility and not for excuses and don't get suckered into the easy way out.

MR. MELROSE: I object to the term suckered, Your Honor, the inference that it implies.

THE COURT: Overruled.

[PROSECUTOR]: Don't—ultimately, don't put this good mother right here in the situation of having to go to those boys and say they let him off—

MR. MELROSE: Objection, Your Honor, it's improper.

THE COURT: Overruled

[PROSECUTOR]: They let him off and the only thing we know is he'll be locked up somewhere for fifty days. That's the only thing we know, boys. He killed your dad right there in front of you, but that's all we can rely on. Don't put her in that situation.

MR. MELROSE: Objection.

THE COURT: Overruled.

The prosecutor proceeded, addressing the evidence presented at trial. When he discussed motive, the exchange continued as follows:

[PROSECUTOR]: They want you to disregard all that evidence of strong motive and say, well he just had this crazy delusion about

following God's orders. Yeah, *that's like people that fly airplanes into buildings for their ends and claim to be doing God's work.* (Emphasis added).

MR. MELROSE: I object to this reference.

THE COURT: Overruled.

MR. MELROSE: It's prejudicial to the jury.

THE COURT: Overruled.

[PROSECUTOR]: Isn't it curious a person carries out their own ill will, their own desire for vengeance, their own reaction on what they call is provocation to serve, and they try to blame it on the good Lord, say the Lord made me do it. My goodness.

Defendant contends the prosecutor's arguments were improper, misleading, inflammatory, and prejudiced his right to a fair trial, and that the trial court abused its discretion in overruling his objections. We agree.

When, in a closing argument, an objection was made and overruled, the standard of review on appeal is whether the trial court abused its discretion by failing to sustain the objection. *State v. Jones,* 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). Upon review of a trial court's rulings with respect to objections to the State's closing argument, the appellate court must first determine if the remarks were improper, and if so, if they were of "such a magnitude that their inclusion prejudiced defendant." *Id.* Remarks in closing arguments must "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial." *Id.* at 135, 558 S.E.2d at 108; *see* N.C. Gen. Stat. § 15A-1230(a) (2003). Once the reviewing court concludes the remarks were improper and were prejudicial to defendant, the defendant must next show that a reasonable possibility exists that "a different result would have been reached had the error not occurred." *State v. Allen,* 353 N.C. 504, 509, 546 S.E.2d 372, 375 (2001); N.C. Gen. Stat. § 15A-1443(a) (2003).

First, we address the trial court's ruling on defendant's objections to the prosecutor's remarks that "it's 99 percent certain a Judge can and will say that, oh that conviction was six or eight or ten years ago, that's irrelevant, release him," and that "the only thing we know is

he'll be locked up somewhere for fifty days." The State refers to N.C. Gen. Stat. § 122C-268.1 which provides that a person committed after being found not guilty by reason of insanity "shall be provided a hearing, unless waived, before the expiration of fifty days from the date of his commitment." N.C. Gen. Stat. § 122C-268.1(a) (2003). If the respondent provides to the court that he no longer has a mental illness or is no longer dangerous to others, "then the court shall order the respondent discharged and released." N.C. Gen. Stat. § 122C-268.1(i) (2003).

Here, the prosecution argued, outside the evidence presented, that it was "99 percent certain a Judge someday *can and will* say . . . release him." Two defense experts testified that defendant's illness could be treated but not cured and that defendant would probably need hospitalization for the rest of his life. Dr. John Warren, a psychologist, testified on cross-examination by the State that although it was a possibility that in nine or ten years a Judge could say prima facie evidence of a homicide committed by defendant was no longer relevant, in his opinion it was a remote possibility. Furthermore, Dr. Warren stated that he'd never seen a case where there was prima facie evidence of a homicide where a judge found the patient was no longer dangerous. Although defendant, if found not guilty by reason of insanity, would be provided a hearing fifty days after his commitment, no evidence supported the State's argument that it was 99 percent certain a judge would find the homicide irrelevant, therefore releasing defendant from commitment.

The remark was also impermissibly prejudicial as it indicated to the jury that defendant, if found not guilty by reason of insanity, would likely be released after a very short period of time. The failure of the trial court to sustain defense counsel's objection was an abuse of discretion.

The prosecutor also suggested a comparison of defendant's acts to the acts committed by the terrorists in their vicious and deadly attacks on New York and Washington on 11 September 2001. In *Jones*, the prosecutor made comparative references to the Columbine shooting and the bombing of the federal building in Oklahoma City. The Supreme Court found these remarks were improper because they (1) "referred to events and circumstances outside the record;" (2) "urged jurors to compare defendant's acts with the infamous acts of others;" and (3) "attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice." *Jones*, 355 N.C. at 132, 558 S.E.2d at 107. Even with

instructions to disregard the remarks, the Court found the impact of the statements was "too grave to be easily removed from the jury's consciousness." *Id.*

Similarly, in the present case, the comparison of defendant's acts to those of the September 11 terrorists, which had occurred only a little over a year earlier, appealed to the jury's "sense of passion and prejudice" by comparing defendant's acts to infamous events outside the record. *Id.* We hold the prosecutor's remarks in this case were also improper and prejudicial and defendant's objections should have been sustained.

In the present case, defendant's commission of the shootings and his mental defect at the time of the shootings were both uncontested; the contested issue at trial was whether defendant knew right from wrong at the time he committed the acts. We cannot say beyond a reasonable doubt that the improper and prejudicial argument by the prosecutor, which was neither checked nor cured by the trial court, did not contribute to defendant's conviction. A different result might have been reached had the trial court properly exercised its discretion to control the prosecutor's misleading characterizations and improper inferences. Therefore, we have no choice but to award defendant a new trial.

In light of our decision, we will not address defendant's second and third arguments since they are not likely to occur in a new trial. Defendant's remaining assignments of error were not brought forward in his brief and are therefore deemed abandoned. N.C.R. App. P. 28(a).

New trial.

Judges McCULLOUGH and ELMORE concur.