STROUD, Judge.
 

 *125
 
 Melissa Amber Dalton ("defendant") appeals from judgments entered on jury verdicts finding her guilty of first-degree murder, first-degree burglary, and assault with a deadly weapon inflicting serious injury. Defendant contends that during the State's closing argument, the trial court erred in (1) overruling defendant's objection to the prosecutor's statements that if the jury found defendant not guilty by reason of insanity, it was "very possible" that she could be released from civil commitment in fifty days; and (2) failing to intervene
 
 ex mero motu
 
 when the prosecutor argued that defendant's request for counsel during a police interview was evidence that she was sane. Finding prejudicial error, we hold that defendant is entitled to a new trial.
 

 I. Background
 

 Defendant suffers from bipolar disorder and borderline personality disorder. She has received mental health treatment since approximately 2005. Defendant is also an active drug user. Starting in her teenage years, she experimented with marijuana, crack cocaine, ecstasy, methamphetamine, mushrooms, and LSD. She eventually developed an addiction to crack cocaine.
 

 In approximately 2005, defendant sought mental health treatment in Tennessee. There, one of defendant's doctors prescribed her Prozac. Prozac is a selective serotonin reuptake inhibitor ("SSRI") antidepressant. Defendant reacted negatively to the medication. She cut her face and legs and reported that she felt more belligerent and angry.
 

 Defendant eventually moved to an apartment in Brevard, North Carolina. Naomi Jean Barker, and her fiancé, Richard Holden, were her neighbors who lived across the street. Defendant once visited Barker and Holden's apartment when she needed to use their telephone. During the summer of 2009, Barker and Holden lent some money to defendant so that she could buy some milk for her infant daughter.
 

 In late July 2009, defendant checked into the psychiatric ward at Mission Hospital and was subsequently transferred to the Neil Dobbins Crisis Center. She was four months' pregnant at the time. Her treating physicians gave her an initial diagnosis of cocaine dependence, cannabis abuse, substance-induced mood disorder, and borderline personality disorder. Dr. Johnson prescribed defendant Lexapro, an antidepressant, and Seroquel. Like Prozac, Lexapro is an SSRI.
 

 *126
 
 On or about 1 August 2009, defendant returned to her apartment and continued to follow her medication regimen from Neil Dobbins. Approximately two or three weeks later, defendant's boyfriend, Corey Howell, noticed that defendant was acting unpredictably. He removed their infant daughter from the apartment and went to the Transylvania County Department of Social Services ("DSS") to seek custody of her.
 

 Between 6:30 p.m. and 8:30 p.m. on 20 August 2009, Howell returned to the apartment to give defendant a note from DSS. When defendant opened the door, Howell noticed that she had been sleeping and appeared to be depressed. She was upset that Howell had taken their daughter away and did not want to speak with him. He called defendant's mother, Kimberly Dalton, for help. Kimberly spoke with defendant, observed her strange behavior, and went to the magistrate's office to request that she be committed to a mental health hospital. Kimberly met with the magistrate around 9:30 p.m. or 10:00 p.m., and the magistrate told her to speak with a social worker and return the following day. Later that evening, defendant exchanged her television, DVD player, and DVDs for one gram of crack cocaine.
 

 In the early hours of 21 August 2009 while Barker and Holden were asleep in their living room, defendant knocked on Barker and Holden's front door and said, "Jean, Jean, open the door. I got Richard's money." Barker told Holden to not open the door. When Holden unlocked the door, defendant immediately entered, pushed Holden against
 
 *548
 
 a wall, and stabbed him with a knife. Defendant stabbed Holden repeatedly until he succumbed to his injuries.
 

 Defendant then approached Barker and said, "I want my money Dorothy. And I want it now." Barker responded, "Amber, Amber, I'm not Dorothy. My name is Jean." Defendant then stabbed Barker six times. Barker called 911 and noticed that the contents of Holden's wallet were scattered on the floor. She suffered serious cervical and spinal injuries, but survived.
 

 Shortly thereafter, a rescue squad member noticed defendant trying to hail cars on the side of a road and alerted police. When the police approached, defendant, who was still wearing bloody clothes from the crime scene, hailed the police car. Agent Ammons interviewed defendant at the police station. When Agent Ammons recited defendant's
 
 Miranda
 
 rights, she refused to speak and requested an attorney.
 
 See
 

 Miranda v. Arizona,
 

 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966).
 

 On or about 5 October 2009, a grand jury indicted defendant for first-degree murder, first-degree burglary, and assault with a deadly weapon
 
 *127
 
 with intent to kill inflicting serious injury.
 
 See
 
 N.C. Gen.Stat. §§ 14-17, -32(a), -51 (2009). on 27 august 2012, defendant notified the state of her intent to raise the defense of insanity, among other defenses. On 8 November 2012, the State moved to commit defendant to Central Regional Hospital in Butner, North Carolina to examine her capacity to proceed and to evaluate her capacity at the time of the homicide. In February 2013, defendant was evaluated by Dr. Bartholomew at Central Regional Hospital.
 

 At trial, defendant raised the defense of insanity and stated that she did not remember any of the events pertaining to her attack or the police interview. Dr. Johnson, who prescribed defendant Lexapro, testified that he was aware of the warnings against prescribing SSRIs to people with bipolar disorder. But he also noted that defendant had been admitted to Neil Dobbins only on a short term basis, to do a "crisis intervention" and he expected that upon release, she would "continue her treatment as an outpatient." He testified: "The idea is that the crisis center is where things get started. But almost always when folks leave there's a lot of work left to do to get things in better order, pick up the pieces, so to say, so to speak."
 

 Defendant's first expert witness, Dr. Wilson, was tendered and accepted without objection to testify as an expert in neuropharmacology and to testify regarding the "effects of drugs, possible drugs on her behavior at the time of this crime." He testified that she had been prescribed Seroquel and Lexapro. He further testified: "Seroquel is an antipsychotic agent. But it was apparently administered at a very, very low dose." Although he noted that the exact chemistry is not well understood, he testified: "What we do know, though, is that somehow these drugs [ (SSRIs, including Lexapro ) ] in special people produce really bizarre behavior and activate mania, activate the hyperactivity, the craziness of people with bipolar disorder. And it is well known. It's even in the prescribing literature." For these reasons, he opined that it was imprudent to prescribe Lexapro to people with bipolar disorder because it can trigger mania and disorganized thinking. Dr. Wilson opined that at the time of the homicide, defendant was in a manic state.
 

 The prosecution's cross-examination of Dr. Wilson was brief. Primarily, the State elicited that Dr. Wilson had not talked to Dr. Johnson and that he had met with defendant only twice. The prosecutor also asked Dr. Wilson, "Would it change your opinion or surprise you in any way if-if Dr. Bartholomew reported that the defendant never reported a manic episode previously to them?" He answered that it would not, since it was his understanding that defendant "carries this diagnosis"
 

 *128
 
 of "manic episodes" from other doctors who had previously treated defendant. The prosecution finished cross-examination by asking Dr. Wilson about his fee, which he answered was "about $11,000" for " a lot of hours."
 

 Defendant's second expert witness, Dr. Corvin, was tendered and accepted without objection as an expert in "the field of clinical
 
 *549
 
 and forensic psychiatry." He had begun his evaluation of defendant only a few weeks after the crime, in 2009, and spent about nine hours interviewing defendant. He noted that he had reviewed defendant's records from her prior psychiatric treatment over many years:
 

 I've read all of the records that have been made available. And they are from numerous facilities, occurring over a long period of time. And some of the facilities have very detailed descriptions of her psychosocial history, the history of her life as we've discussed. And I have read all of them and [have] taken extensive notes from them. And the reason to do that is to then try to take a step back and look at the universe of her psychiatric history and come to what I hope and believe is an accurate formulation.
 

 He opined that defendant's history with antidepressants revealed that they made her more combative and explosive and that the prescription drugs, crack cocaine, and defendant's underlying mental illness all affected her state of mind at the time of the homicide. He also opined that defendant's choice to hail a police car while still wearing bloody clothes from the crime scene demonstrated a lack of understanding about the significance of her actions. Dr. Corvin further opined that defendant did not understand what occurred in the police interview and did not understand that she had just committed a serious felony. The State cross-examined Dr. Corvin, particularly regarding defendant's past psychiatric history and her prescribed medications and illegal drug use. The State also asked Dr. Corvin about his review of the report by Dr. Bartholomew, who had evaluated defendant more than three years after the homicide, and focused mainly on things that defendant had or had not reported to Dr. Bartholomew.
 

 The State did not present any expert witnesses to address defendant's mental condition. The State did not seek to introduce Dr. Bartholomew's report and there was no evidence of his ultimate conclusions. Thus, the evidence noted above from defendant's expert witnesses was the only evidence before the trial court on these issues.
 

 *129
 
 Defendant testified that Holden had loaned her $20 and that Howell had paid him back on her behalf. But Barker testified that defendant owed $55 to Holden at the time of the homicide.
 

 During the jury charge conference, the prosecutor asked if he could comment on the civil commitment procedures that would take effect if the jury returned a verdict of not guilty by reason of insanity. The trial court cautioned the prosecutor to not exaggerate defendant's chance of being released after fifty days. During the State's closing argument, the prosecutor subsequently made the following argument:
 

 [Prosecutor]:.... [Defendant] doesn't remember, so she says you can't hold me accountable, so find me not guilty by reason of insanity.
 

 And that way, as one of the lawyers mentioned, then she can be committed to a hospital if you find that verdict.
 
 And it is very possible that in 50 days, if she shows by a preponderance of the evidence that she is not a threat to anyone else or herself, she will be back home.
 

 [Defendant's counsel]: Objection.
 

 THE COURT: Overruled.
 

 [Prosecutor]:
 
 She very well could be back home in less than two months.
 
 She is asking you, ladies and gentlemen, to look at Ms. Barker, Naomi Jean Barker, to look her in the face and say, Ms. Barker, we are sorry that the sanctity and security of your home was violently violated on August 21, 2009, that your fiance was diced up like a tomato, left in a fetal position dead. Sorry, Ms. Barker.
 

 (Emphasis added). The prosecutor also argued, without objection, that defendant's request for a lawyer during the police interview was evidence of sanity.
 

 On or about 14 April 2014, the jury found defendant guilty of first-degree murder under a theory of felony murder, first-degree burglary, and assault with a deadly weapon inflicting serious injury. The trial court sentenced defendant to a term of life imprisonment without parole for the first-degree murder conviction and a term of 26 to 41 months' imprisonment for the assault with a deadly
 
 *550
 
 weapon conviction. The trial court arrested judgment on the first-degree burglary conviction. Defendant gave notice of appeal in open court.
 
 *130
 
 II. Closing Argument
 

 Defendant argues that during the State's closing argument, the trial court erred in (1) overruling defendant's objection to the prosecutor's statements that if the jury found defendant not guilty by reason of insanity, it was "very possible" that she could be released from civil commitment in fifty days; and (2) failing to intervene
 
 ex mero motu
 
 when the prosecutor argued that defendant's request for counsel during a police interview was evidence that she was sane. Because we find prejudicial error on the first issue, we need not address the second issue.
 

 A. Preservation of Error
 

 The State argues that defendant failed to preserve error with respect to the prosecutor's statement: "She very well could be back home in less than two months." But the prosecutor made this statement
 
 immediately
 
 after the trial court overruled defendant's objection to the prosecutor's statement: "And it is very possible that in 50 days, if she shows by a preponderance of the evidence that she is not a threat to anyone else or herself, she will be back home." The prosecutor simply returned to his argument and reiterated his statement after the trial court overruled defendant's objection to the first statement. Accordingly, we hold that defendant has preserved error as to both statements.
 
 [1]
 

 B. Standard of Review
 

 In addressing a closing argument by the State regarding the possibility that a defendant who is found not guilty by reason of insanity may be released, our Supreme Court has set forth the proper standard of review:
 

 [C]ounsel must be allowed wide latitude in the argument of hotly contested cases. He may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his side of the case. Whether counsel abuses his privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury.
 

 *131
 

 State v. Allen,
 

 322 N.C. 176
 
 , 195,
 
 367 S.E.2d 626
 
 , 636 (1988) (citations omitted).
 

 C. Analysis
 

 Defendant contends that during the State's closing argument, the trial court erred in overruling defendant's objection to the prosecutor's statement that if the jury found defendant not guilty by reason of insanity, it was "very possible" that she could be released from civil commitment in fifty days. She argues that these statements were improper because they were based on information outside of the evidence and contrary to the law. A closing argument must "(1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial."
 
 State v. Jones,
 

 355 N.C. 117
 
 , 135,
 
 558 S.E.2d 97
 
 , 108 (2002). An incorrect statement of law in closing argument is improper.
 
 State v. Sanders,
 

 201 N.C.App. 631
 
 , 642,
 
 687 S.E.2d 531
 
 , 539,
 
 disc. review denied,
 

 363 N.C. 858
 
 ,
 
 695 S.E.2d 106
 
 (2010).
 

 The prosecutor's statements refer to civil commitment procedures that take effect after a verdict of not guilty by reason of insanity.
 
 See
 
 N.C. Gen.Stat. §§ 15A-1321, 122C-268.1 (2013). If a jury finds a defendant not guilty by reason of insanity, the trial court must order that the defendant be civilly committed. N.C. Gen.Stat. § 15A-1321. Within fifty days of the date of commitment, the trial court will provide a hearing to defendant.
 

 Id.
 

 § 122C-268.1(a). At that hearing, if a defendant shows by a preponderance of the
 
 *551
 
 evidence that she (1) no longer has a mental illness; or (2) is no longer dangerous to others, the court will release the defendant.
 

 Id.
 

 § 122C-268.1(i). An adult is mentally ill when she has "an illness which so lessens the capacity of the individual to use self-control, judgment, and discretion in the conduct of [her] affairs and social relations as to make it necessary or advisable for [her] to be under treatment, care, supervision, guidance, or control[.]"
 

 Id.
 

 § 122C-3(21) (2013). "Dangerous to others" means that
 

 within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining
 
 *132
 
 reasonable probability of future dangerous conduct.
 
 Clear, cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.
 

 Id.
 

 § 122C-3(11)(b) (emphasis added).
 

 In
 
 State v. Millsaps,
 
 this Court addressed the scope of a proper argument concerning civil commitment procedures.
 
 169 N.C.App. 340
 
 ,
 
 610 S.E.2d 437
 
 (2005). There, the defendant raised the defense of insanity to charges of first-degree murder, felonious breaking and entering, assault with a deadly weapon with intent to kill inflicting serious injury, and three counts of assault with a firearm on a law enforcement officer.
 
 Id.
 
 at 341,
 
 610 S.E.2d at 438
 
 . During the State's closing argument, the prosecutor argued, "We submit it's 99 percent certain that [a judge] someday can and will say that, oh that conviction was six or eight or ten years ago, that's irrelevant, release him."
 
 Id.
 
 at 345,
 
 610 S.E.2d at 441
 
 . This Court held that this argument was improper and noted that the defendant had proffered expert testimony that he would never overcome his mental illness, and that even in ten years,
 
 prima facie
 
 evidence of a homicide would remain relevant in determining whether the defendant posed a danger to others.
 
 Id.
 
 at 348,
 
 610 S.E.2d at 442-43
 
 . This Court held that the error was prejudicial and awarded a new trial.
 
 Id.
 
 at 348-49,
 
 610 S.E.2d at 443
 
 .
 

 Similarly, here, no evidence suggests that defendant's release in fifty days was "very possible"; rather, the evidence shows the opposite. First, Dr. Corvin testified that defendant would suffer from bipolar disorder and borderline personality disorder for the rest of her life. Thus, it is highly unlikely that after fifty days, defendant could show that she was no longer mentally ill. Second, the State's uncontroverted evidence that defendant committed a homicide is "prima facie evidence of dangerousness to others."
 
 See
 
 N.C. Gen.Stat. § 122C-3(11)(b). The gravity of defendant's offenses makes it extremely unlikely that defendant could overcome this presumption in such a short time. Indeed, based upon all of the evidence presented, such a quick release would appear to be virtually impossible.
 

 The State responds that a judge would likely find that defendant is no longer dangerous to others because her violent act was caused by a "perfect storm" of illegal drug use, mental illness, and improper prescription drugs, and with proper treatment, her chances of recidivism are low. But Dr. Corvin testified that defendant's risk of recidivism would significantly increase if she were untreated and resumed her highly unstable
 
 *133
 
 lifestyle. Furthermore, Dr. Corvin testified that defendant would always be a drug addict. We also note that in making this argument, the State is essentially accepting defendant's evidence regarding her drug use and mental illness as true but is arguing that we should ignore the uncontroverted expert evidence regarding defendant's actual risk of recidivism based upon these factors. Therefore, we hold that the prosecutor's argument goes beyond "the facts in evidence and all reasonable inferences to be drawn therefrom" and was therefore improper.
 
 See
 

 Allen,
 

 322 N.C. at 195
 
 ,
 
 367 S.E.2d at 636
 
 . As noted above, the State did not present
 
 any
 
 expert medical or psychiatric evidence to refute the testimony of Dr. Corvin and Dr.
 
 *552
 
 Wilson regarding defendant's long-term, serious mental disorders and drug addiction.
 

 The State attempts to distinguish
 
 Millsaps.
 
 But the prosecutor's statements here are even more improper than the statements in
 
 Millsaps.
 
 There, the prosecutor argued that it was "99 percent certain" that the defendant would be released
 
 after six or eight or ten years,
 
 but, here, the prosecutor argued that defendant's release was "very possible"
 
 after fifty days.
 

 See
 

 Millsaps,
 

 169 N.C.App. at 345
 
 ,
 
 610 S.E.2d at 441
 
 . Accordingly, we do not distinguish
 
 Millsaps.
 

 The State's reliance on
 
 State v. Allen
 
 is misplaced.
 
 See
 

 322 N.C. at 195
 
 ,
 
 367 S.E.2d at 636-37
 
 . In
 
 Allen,
 
 the defendant raised the defense of insanity to charges of first-degree murder and first-degree arson.
 
 Id.
 
 at 181-82,
 
 367 S.E.2d at 628-29
 
 . During closing argument, the prosecutor misstated the maximum recommitment period.
 
 Id.
 
 at 195,
 
 367 S.E.2d at 636-37
 
 . Our Supreme Court held that this mistake did not amount to a grossly improper argument.
 
 Id.
 
 at 195,
 
 367 S.E.2d at 636-37
 
 . The Supreme Court also noted that "[w]hen considered in the totality of the argument, this misstatement did not rise to the level of prejudicial error."
 

 Id.,
 

 367 S.E.2d at 637
 
 . In contrast, here, the prosecutor mischaracterized defendant's chances of release by stating that it was "very possible" that defendant would be released in fifty days, even after being warned by the trial court not to exaggerate defendant's chances of release. Even taken within the context of the entire argument, the prosecutor's argument rises to the level of error.
 

 The State next argues that a judge could allow defendant to go "back home" after fifty days by allowing her an outside visit, even if she were committed for a longer time. Considering the prosecution's argument in context, it is doubtful that any juror would have understood the argument in this way. But even if that were possible, a defendant generally cannot make an outside visit if "[c]ommitment proceedings were initiated as the result of the [defendant's] being charged with a violent crime,
 
 *134
 
 including a crime involving an assault with a deadly weapon, and the [defendant] was found not guilty by reason of insanity or incapable of proceeding[.]" N.C. Gen.Stat. § 122C-62(b)(4)(a) (2013). Because defendant was charged with first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury, defendant would have no right to an outside visit.
 
 See
 
 id.
 

 Although it is true that a "court order may expressly authorize visits otherwise prohibited[,]" the State proffers no reason in either the evidence or the law why it is "very possible" that a court would elect to override this general prohibition after fifty days given the particular circumstances of this case.
 
 See
 

 id.
 

 § 122C-62(b)(4). The prosecutor stated that it was very possible that she could "be back home" in only fifty days and did not qualify that defendant's return would be for just a temporary outside visit. The prosecutor's statements thus were contrary to the law as applied to these facts.
 

 The State further argues that the prosecutor's statements were proper because a judge could conditionally release defendant after fifty days pursuant to N.C. Gen.Stat. § 122C-277 (2013). The State argues that defendant's attending physician could recommend that she receive outpatient treatment or be released on "specified medically appropriate conditions."
 

 Id.
 

 § 122C-277(a). But in order to conditionally release a patient found not guilty by reason of insanity, the judge must apply the same standards and follow the same procedures as if he were determining whether to unconditionally release the patient.
 

 Id.
 

 § 122C-277(b1). In other words, defendant would still have to show by a preponderance of the evidence that she (1) no longer has a mental illness; or (2) is no longer dangerous to others.
 

 Id.
 

 §§ 122C-268.1(i), -277(b1). Because it is highly unlikely that defendant would be able to bear this burden, the prosecutor's argument was contrary to the law as applied to these facts.
 

 The State finally contends that the prosecutor's argument was proper because a physician or eligible psychologist could recommend defendant for outpatient treatment after fifty days pursuant to N.C. Gen.Stat. § 122C-263(d) (2013). Again, it is highly unlikely that the jury would have understood the prosecutor's statement as referring to outpatient treatment. But even if
 
 *553
 
 they did, the law does not support this argument either. N.C. Gen.Stat. § 122C-263(d) governs admission procedures and describes the findings that a physician or eligible psychologist must make in determining whether to recommend a patient for inpatient commitment or outpatient treatment or no treatment, and thus does not apply to defendant, because, had she been found not guilty by reason of insanity, she would have been automatically committed pursuant to N.C. Gen.Stat. § 15A-1321. We also note that the physician or
 
 *135
 
 eligible psychologist must recommend inpatient commitment if he finds that the patient is mentally ill and is dangerous to self, as defined in N.C. Gen.Stat. § 122C-3(11)(a), or others, as defined in N.C. Gen.Stat. § 122C-3(11)(b).
 
 See
 
 N.C. Gen.Stat. § 122C-263(d)(2). Accordingly, the prosecutor's closing argument that it was "very possible" that defendant would be released from civil commitment after fifty days was contrary to the law as applied to these facts. We thus hold that the prosecutor's argument was improper.
 

 D. Prejudice
 

 Defendant argues that the prosecutor's improper argument prejudiced her. When a court determines that an argument is improper, a defendant must prove that the statements were "of such a magnitude that their inclusion prejudiced [the] defendant" and that "a reasonable possibility exists that a different result would have been reached had the error not occurred."
 
 Millsaps,
 

 169 N.C.App. at 347
 
 ,
 
 610 S.E.2d at 442
 
 (quotation marks omitted);
 
 see also
 
 N.C. Gen.Stat. § 15A-1443(a) (2013).
 

 Here, two witnesses testified that defendant was behaving extremely unpredictably immediately before the homicide. Howell testified that he was concerned about defendant's behavior and decided to remove their infant daughter from their apartment. Defendant's mother sought to have her committed to a mental hospital less than twenty-four hours before the homicide. Defendant also presented evidence that she reacted negatively to SSRIs. In 2005, while taking Prozac, she cut her face and legs and reported that she felt more belligerent and angry. During the weeks before the homicide, defendant had been taking Lexapro, an SSRI.
 

 During the attack, defendant mistakenly called Barker "Dorothy," even though they knew each other. After defendant left the apartment, she hailed a police car while still wearing bloody clothing. Dr. Corvin opined that during the police interview, defendant did not appreciate the nature of her actions and did not appear to understand the gravity of her crimes. Both Dr. Wilson and Dr. Corvin opined that at the time of the homicide, defendant was in a manic state.
 

 We also note that during the jury's deliberations, the jury sent a note requesting Dr. Bartholomew's report. The trial court denied this request because the State had not introduced Dr. Bartholomew's report into evidence. The jury note indicates that during its deliberations, the jury wrestled with defendant's argument of insanity.
 

 Given the brutality of defendant's attack, we believe it likely that the prosecutor's statements about the likelihood of defendant's release in
 
 *136
 
 fifty days alarmed jurors and motivated them to render a guilty verdict. The evidence raised no dispute that defendant committed serious and extremely violent crimes, and there was no real dispute that defendant suffered from long-standing psychiatric and substance abuse problems. The only real question presented to the jury was whether defendant would spend the rest of her life in prison or be committed to a psychiatric facility. It is difficult to imagine any reasonable juror accepting defendant's argument of insanity if that may result in her "very possible" release in only fifty days. Defendant presented abundant evidence supporting an inference that she was insane, and the State presented no evidence to the contrary, other than its cross-examination of her expert witnesses. Although we recognize that the credibility and weight of all evidence must be determined by the jury, no evidence supported the State's argument about defendant's "very possible" release in less than two months. We therefore hold that a "reasonable possibility exists that a different result would have been reached had the error not occurred" and thus the prosecutor's improper
 
 *554
 
 argument prejudiced defendant.
 
 See
 

 Millsaps,
 

 169 N.C.App. at 347
 
 ,
 
 610 S.E.2d at 442
 
 (quotation marks omitted).
 

 III. Conclusion
 

 For the foregoing reasons, we hold that the trial court committed prejudicial error in overruling defendant's objection during the State's closing argument. Accordingly, we hold that defendant is entitled to a new trial.
 

 NEW TRIAL.
 

 Judges MCCULLOUGH and INMAN concur.
 

 [1]
 

 We note that the ground for defendant's objection was apparent from the context, especially in light of the trial court's warning to the prosecutor during the jury charge conference not to exaggerate defendant's chance of release from civil commitment.
 
 See
 
 N.C.R.App. P. 10(a)(1).